JUSTICE RICE,
concurring.
¶84 I concur with the Court’s resolution of all issues, but offer further observations about Issue 2A.
¶85 I agree with the Court that the Commissioner was permitted, over Wittich’s objection, to improperly offer his opinion about ultimate legal conclusions. Further, in what may have been a strategy, the Commissioner was permitted to reformulate issues that would be given to the jury, such as the reporting of campaign contributions and maintaining campaign records, into alternately phrased legal obligations, such as “transparency” and “public trust.” For example, the Commissioner testified on direct examination:
Q. What role do campaign records kept by a candidate play in regard to Montana candidate elections?
A. Well, consistent with the requirement of transparency is the requirement that a candidate meet the public trust obligation. The public trust obligation is that a candidate running for office, a candidate serving in office, serves the public and not a private interest. It is the interest of the public that a candidate must serve. Consistent with that, then, when a candidate runs for office, the records of their campaign must be available for inspection. ... That is consistent with the public trust obligation.

It shows a degree of humility on the part of the candidate and acceptance of their responsibility to the public at large, rather than just to themselves.
¶86 Wittich offered another objection at this point in the proceeding, although we have no record of the following discussion. Nonetheless, the Commissioner was permitted to use the witness stand as a soap box for his own vision of campaign finance (“[T]he idea is this: Government functions best in governance if the public believes and understands the influences on government.” “[Its] just the culture we have in Montana.”). He was permitted to weave legal-sounding concepts into his testimony, such as “public trust,” as quoted above, and the requirement of “transparency” in campaigns (“So the word that is used is transparency. So the campaign finance reports, when filed, are intended to inform voters. ... so it’s supposed to be complete transparency.”) and then testify that Wittich had violated these *375 concepts (“[M]y opinion is that, as a matter of fact, this record production fails the public trust obligation that is inherent in every candidate for office in the State of Montana.”). Violation of the law was thus conveyed to the jury through the Commissioner’s testimony.
¶87 Even further, the Commissioner was permitted to use inappropriate, political labels that could have the effect of painting Wittich as sinister (“That is dark money. It is dark in every way you can get it.”).
¶88 These statements should not have been admitted, and if they constituted a significant part of the Commissioner’s testimony, I would vote to reverse Wittich’s conviction. However, the Commissioner’s lengthy testimony was dominated by hard factual evidence of campaign law violations. For example, the Commissioner testified on direct:
Q. [C]an you identify paid personal services that were provided in the 2010 Senate District 35 primary election that are not listed on Mr. Wittich’s campaign finance reports for that election?
A. I can do that. Those paid personal services include general campaign management provided Art Wittich by National Right to Work staffers Christian LeFer and Sarah Arnold, specific campaign management provided by Sarah Arnold in the form of processing and distributing the candidate profile, candidate biography and candidate photos in a manner that allowed use by the National Right to Work staff in Virginia and in Montana, the graphics, website, and programming by National Right to Work staffer Andrew O’Neill, the campaign opponent research by National Right to Work staffer Sarah Arnold, the writing and copying ... that were sent out to voters, the writing and copy for seven candidate letters, including the wife letter, by National Right to Work staffer Jedd Coburn, the editing of that letter by National Right to Work staffers Christian LeFer and Sarah Arnold, the development of the voter ID list for the entirety of Senate District 35 and delivery of that list to Art Wittich as a walking list.
¶89 While the Commissioner was not properly reined in while on the stand, he did get to the meat of the matter, and offer proper factual information that Wittich had violated the law, as well as proper expert testimony informing the jury about the finance process. In the context here, including overlapping concepts of fact and law, I believe the Commissioner’s statements about the law did not prejudice the outcome or otherwise undermine the propriety of the proceeding.
¶90 I concur.